Good morning, Your Honor. It's Eric Slotkin on behalf of Ms. Larkin. We're here to discuss a social security disability claim that has been going on for quite some time. She's been subjected to a number of appeals as well as hearings, and we believe that the record establishes that the ALJ committed legal error. Your Honor, when we look at these cases, the first thing I want to point out is the burden of proof. In this case, Ms. Larkin established that she does suffer from medically determinable impairments that preclude her from performing her past work. So the burden of proof is on the other side to show that Ms. Larkin can sustain other work. In this case, we have the opinion of a treating physician. He's assessed restrictions and limitations that would be incompatible with the ability to sustain work. This is Dr. Mestis? Yes. And he's indicated that he believes that Ms. Larkin suffers from a medical problem resulting in quite severe pain. Does it matter that she had other treating physicians who thought otherwise? It would matter if they opined otherwise, but I'm not so sure that they did in this case, Your Honor. Dr. Weinegrad suggested that the claimant had responded favorably in the past to conservative treatment, and he recommended that they do it again. He said that if it didn't work, he would recommend that maybe she go get an orthopedic surgical consultation. He did not see her after that. It didn't work. She went for an orthopedic surgical consultation, and in fact, she tried to kill herself twice. The first time she tried to kill herself, almost successful. They had a resuscitator. She had OD'd on her pain medications, and when they talked to her about it, she said, I was in so much pain, I decided to take too much of my medication. This was all after the irrelevant period. No. This is during the period of time. I thought during the relevant period she said it was accidental. No. The first time that she tried to commit, she tried to overdose on her medication was in April. I'm sorry. Let me see when that was. The first time is within the period of time, Your Honor. But that was the time when she said it was accidental. October 30th of 1995. Well, she took 100 soma. That's quite a large number, and she was experiencing pain, and they said that in addition to psychological evaluation that they were, again, they were working her up for a surgical consult. Now, she lived in a fairly difficult area to get appropriate medical evidence, and that's established. She was also having some difficulty with a work carrier who was, she wanted to pay for some of this. They refused to approve her for an EMG study. So she was quite limited in what her options were. You know, right around this time when she overdosed on her soma, when she was being worked up for the consultation, you can see that it's not that her pain got worse. It stayed really, really bad. And then they did do surgery. Now, the ALJ found it significant that that surgery was a year, I think 13 months after the time we're talking about. But if you look what happened, they were working her up for this right from the get-go. They were talking about her pain. They were talking about radiculopathy. And when I was talking to defendant's doctor, and they put a lot of weight on this defendant's doctor, I asked him about this. And he said, well, the opinions that I'm going to give today are not going to consider Ms. Larkin's individualized response to pain. I'm going to give you an opinion, as I would for anybody with the objective evidence that I see for her. That's not what our law provides. The whole purpose of having these hearings is to see how she reacts to pain. Otherwise, we don't need them. And there's a case that says it. It would be superfluous. Just look at the objective medical evidence, make a decision. We don't have to talk to her. It's not how it works. Kagan. And I think what the case law says is that we're supposed to take that as long as her subjective pain is consistent with the medical evidence. Yes. Then it can't be discounted without clear evidence or basis, a basis. Did you understand the consulting physician here to be saying it wasn't consistent? I would have to say that he flip-flopped on that on a number of occasions. He ultimately agreed that Ms. Larkin has a medical problem that he would expect to produce some degree of pain, that the treating physicians were treating her as if she had a high level of pain, and importantly, he wouldn't agree he wouldn't disagree with the treating physicians. Now, he didn't come out and say he'd agree with them, but he did say he wouldn't disagree with them. And then there was a whole issue about this give-away weakness, and I asked the doctor about that, too. And he specifically said it can be due to pain. The only way to tell is to look at what the treating doctor said, and he would not dispute that Ms. Larkin's give-away pain was due to – give-away weakness was due to pain in this case. We have his testimony on that. And I'm raising that because I was just handed a case that the defendant told me they intend to be discussing with you regarding give-away weakness, which I had no notice of. But we discussed it. It was fully developed at this hearing. Their doctor – and I can quote him – he says, yeah, it could be due to pain. And the neurologist – I think it was a neurologist, it might have been an orthopedist who did the exam – said give-away weakness secondary to pain. So as I was saying, she underwent one surgery. It didn't help. So she underwent another surgery. It didn't help. And she ultimately underwent a fusion. And if I understand the defendant's position correctly, saying, well, the surgeries didn't happen until after, so we're not really going to consider that, which really is not a fair thing to do. You look at when the symptoms were there, when the pain was there, and what led up to surgery. You wouldn't expect, and it didn't happen here, that from day one, boom, we're going to just do surgery without trying all these other means. There's a herniated disc, which is confirmed by MRI. Now, I think they used the term mild, which apparently is causing grave concern for the defendant. But it impinges upon the nerve root. And in addition to the herniated disc, that MRI showed that there was abnormal signal intensity at L4-5, L5-S1. So there was a number of levels involved. She's had a very tragic accident beforehand with some degenerative changes resulting in her spine. So when you look at all this evidence, it's very, very consistent. And that's the point I was trying to make to the judge when we were doing the examination of their doctor, who said, you know what? If she has severe pain, she probably can't work, because she's going to be missing time from work. And he would agree that these medical records say that she has that kind of pain. Just if he doesn't consider her subjective complaints, then in that instance, he's going to say she can work. It's just not how the law is structured. And the judge doesn't even address this. So when we look at what the judge actually did, because that's our obligation here, is to review the decision that was issued on benefit, you know, did he find sufficient reason to reject treating physician opinion evidence? You know, if you look at what their doctor says, there's a cause for this pain. She's being treated for it. It's moderately severe to severe. She's gone through three surgeries. So there's obviously something that's going on here. She's tried to kill herself twice because she's looking for a way out of this pain. So there's really no reason to reject the treating physician opinion on this. And then the defendant's interpreting the testifying physician, defendant's physician, as contradicting everything, but he's really not. He's saying, yeah, I understand what the treating physician's saying. It's just when I look at the MRI, I think it's going to be something different. That's not a contradiction. And then we have the subjective complaints. She's been consistent the entire time. You know, she's had extreme back pain. She's on medication. She's trying to do what she can to get out of the pain and ultimately goes through the surgery. And you know what? She says, you know what? I can do life household chores. It hurts for prolonged sitting, standing, walking, but I can do a little bit. That's not a basis to find someone not credible. In fact, it would be peculiar to read, I can't do anything, or I can do everything. She said exactly what one would expect her to say if she was in the degree of pain that she's suffering from. And so when we look at her daily activities, I'll refer you to the FAIR cases. I mean, there's a plethora of cases that talk about we expect people to be able to carry on some normal daily activities. But in social security, disability is defined as eight hours a day, five days a week, on a regular and consistent basis. And our case law recognizes that there's a grueling pace. Frequent absences, you're out. Slowed pace, you're out. When we get beyond those two arguments, Your Honor, then I would talk to you about the vocational analysis, where, again, looking at defendant's burden of proof, it's on them. They call a vocational consultant in. Defendant's doctor said, based solely on what I see and not considering idiosyncratic response to pain, that she can do A, B, C, and D, which is less than a sedentary residual functional capacity. There are more restrictions as a sit-stand option. So they call a vocational expert who says, I think she can do two jobs. And where's the proof? Well, I have no proof. It's based solely on my opinion. That's not enough to meet the standard of proof. So in looking at remedy, I would ask you to remand for a computation of benefits. She started years ago. She's had numerous orders of remands. She's had many hearings. In one hearing, she showed up and they said, you know what, this is after a district court remand. They said, oh, we didn't give our medical consultant your medical records, so we can't even go. And they took over a year to schedule that hearing as it was. And enough is enough. This lady needs help. Okay. You will have three and a half minutes to rebuttal. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honors. My name is Elizabeth Feher. I represent the Commissioner of Social Security in this case. And I would agree with my opponent that the evidence is relatively consistent in this case. We have a 48-year-old woman with a small herniated disc and an ALJ who limited her to less than sedentary work. In our opinion, that's perfectly reasonable. The ALJ's RFC finding is supported by her allegations of disability are inconsistent with no less than six doctors during the relevant period. That's treating neurologist Dr. Winograd. And, Your Honor, it is significant there's another treating doctor who didn't find disabling limitations. And just to give you a little timeline there, Dr. Winograd was the neurologist who didn't find any disability. He found normal clinical findings. My opponent said he was – she was then referred to an orthopedic specialist. That was Dr. Hales, who specifically said this MRI is normal for someone, can be found normal for someone of her age, didn't find any significant limitations. And, you know, that's what we have here. What is the relevance of the later periods? I mean, it appears that in essence she was right in the sense that later doctors did find that serious enough circumstance that she had several surgeries. The first surgery was 13 months after the insured period expires. She's last insured in December of 1995. She first had surgery. How come most people with normal MRIs don't have surgery 13 months later? Well, I can't tell you specifically where it is in the record, but there are subsequent diagnostic studies that show a worsening of her condition. And we don't know what she did between the time she stopped being insured and the time her condition warranted surgery. The first consultative examiner, Dr. Friedman, says she's coming in there complaining of disabling, excruciating back pain. She's wearing two-inch heels. He recommended that she lose some weight to alleviate pressure on her back. She's been recommended for physical therapy numerous times and didn't apparently go. Those are all conditions, they're all situations that could have exacerbated her condition after the date last insured. What's relevant here is the date last insured and what evidence is in the record during that period. And then we have that mild herniated disc. We have her evidence of exaggerating her symptoms, and that's give way weakness. Three doctors noted that. Dr. Winograd noted it. Dr. Hales, I believe, noted it. And then the testifying medical experts noted it. And I gave you that case, Thiebaud, just to show that this Court has specifically stated that give way weakness is consistent with malingering. But there was no finding here of malingering. I'm sorry? There was no finding of malingering. The symptom exaggeration. Dr. Hales said that her – Do you know what give way weakness is? Yes. I mean, you know what? Judge Fletcher asked me this question at one of my last hearings. It's when your muscles just give way under pressure. It is specifically a Wattles sign. Wattles is the Scottish doctor who came up with all these symptoms to elicit whether or not someone was exaggerating pain behavior. That's one of them. It's very rare to have the kind of weakness that would make your muscle give way upon testing like that. I believe Dr. Hales said she had it under every group of muscles. There's no – there's just no reason for that. It's not unreasonable for a doctor to have concluded that means her subjective allegations were not credible. Who concluded that? Well, Dr. Temple, my opponent says that his testimony was equivocal or that he flip-flopped about pain allegations. I would really like to point out that Dr. Temple never once wavered in the functional capacity that he assessed. He said that – Well, but he said he was doing – he was not taking into account her individual pain reaction. But he also said he was taking into account pain as I would expect it to be. Right. Claimant can allege as much pain as she wants. Nobody has to believe it. The ALJ didn't believe it. But he didn't even say he didn't believe it. He said he was just sort of taking an average of what he would expect. Well, actually – well, this is – I said the ALJ. Dr. Temple said, yes, what he would expect given the objectives. That's – in the context of a disability claim, you can't just – a claimant's subjective allegation of how much pain she is in doesn't – isn't the be-all, end-all. If that were the case, then truly there would be no reason for the reason. But I think our case law, rightly or wrongly, essentially runs in the other direction. It says unless the physical manifestations are inconsistent with the level of pain she's claiming, then you look at her subjective testimony and that of her doctor separately and see whether it's credible or not credible. That you don't rely on – because the whole recognition appears to be that reactions to pain do vary from individual to individual and that you can't tell what somebody's pain level is by looking at objective manifestations. So then you look to the other factors. Right. And in this case, we do have other factors. We have evidence of exaggerating the pain with the giveaway weakness. We have her over-medication. That's not something just the ALJ said. Well, I understand the over-medication thing. Explain to me how the over-medication impeaches her treating doctor or her. Well, I – Rather than the other direction. It goes to – there are two examining doctors, Hales and actually three, Freeman and Winograd, all said she was being over-medicated. Okay. These are doctors who are experts in orthopedics. Well, that may say they don't believe her pain and Dr. Masties did, but how does it discredit Dr. Masties? I don't understand that. Because he's giving too much credence to her subjective allegations of how severe her pain was. He's the only doctor that did that. There are all these other doctors who didn't agree with it. And I would like to point out, just getting back to the reasonableness of the ALJ's findings here, there are two DDS doctors, State Agency Disability Reviewing Experts, who found a much greater RFC than the ALJ ended up going with based on Dr. Temple's testimony, and one found medium and one found light. So the ALJ isn't being unreasonable in this case. He understands that this claimant has some pain, and he limited her to a range of sedentary work with a sit-stand option that is actually defined in the record contrary to what is sustained in the reply brief. The V.E.'s testimony was very detailed. The M.E.'s testimony was very detailed. But the V.E. testified that he, in his own, the course of his job, he's interviewed local employers, he's observed these jobs. He found that they would accommodate a sit-stand option at will. That's as lenient as you can get. This Court has flat-out stated a vocational expert's recognized expertise provides the basis for, the foundation for his or her testimony. That's Bayless. It's right there. I believe it's even in Austin Brock also. So it's not true that the V.E. has to come up with all these additional support systems for what he said. His testimony, his qualifications were not objected to. He provided detailed testimony. That's it. And with regard to Dr. Temple's testimony, I've never seen M.E. testimony as detailed as that. It's 32 pages long. He talks about pain back and forth, but he doesn't endorse claimants to specific level of pain in this case. And that's perfectly valid. It's the ALJ's job to take everything in the record and come up with an RFC finding, which he did in this case, and it's supported by, as I said, three doctors who treated her who didn't find her allegations of And then we have a doctor testifying who basically synthesized that entire record, very, very clearly, very detailed, in a very detailed manner. And we believe that the Commissioner's decision is perfectly reasonable. There's one other thing I wanted to say that my opponent stated, that the Commissioner's burden is to show that the claimant can perform other jobs. The Step 5 burden is actually just to identify specific jobs that the claimant can perform once that RFC has been assessed. And that's what happened here. So if you don't have any further questions. Thank you very much. If you have any rebuttal, we have a few minutes left. But you don't have to take them. No, I would like to just make some references, Your Honor, to the testimony of Dr. Temple. I ask him, quote, Do you have any reason to disagree that Ms. Larkin was not experiencing severe pain at the time? Answer, I don't. Well, I have no reason to disagree with the treating physicians. Period. And that's at page 62A of the transcript. And later on, I ask, and, Doc, I know I asked this question before, but I just want to make sure I understand it. So when you give us the restrictions and limitations, you are not including the effects of pain. Answer, I'm including the effect of pain as I would expect it should be. Question, okay. So it doesn't account for any individual's differences in pain tolerances? No. Then he explains, which is not an unreasonable thing to consider, but I can't do that here. He's indicating that, hey, she's got a real problem. Well, did you understand the ALJ to premise his disapproval of Dr. Macy's on Dr. Temple's statements? Yes. I took the decision of the ALJ to just say I'm accepting whatever Dr. Temple had told me at this hearing. And he tried to incorporate that RFC right into the decision. He also relied on the fact that Dr. Macy's reports were kind of confused. Well, there was an issue with the residual functional capacity assessment, where he indicated in one section that the claimant could function maybe three hours in a day. Actually, he said three hours at a time, but then it ended up being a half hour in a day or an hour and a half in a day. And there was a question as to whether the doctor just made a mistake, as to which he marked whether it was a total eight-hour day or at one time. But I would point out a couple of things. Dr. Winograd never said my client can work. And when counsel says that he gave an RFC or an opinion that my client wasn't disabled, it's not accurate. It's not here. It's not in the record. He says she has a herniated disc and that she should get an orthopedic consultation if other treatments don't work. And I wanted to point out that Dr. Temple also said that give way weakness, and I can quote it, he says, can be due to pain, and he has no reason to find or disbelieve that Ms. Larkin's give way weakness was not due to pain. And that testimony is at page 67A. Quote, well, give way with this, of course, can be due to pain. It also can be due to other factors, but he admits it can be due to her pain. Thank you very much. Thank you both of you for a helpful argument. The case of Buckner-Larkin v. Astro is submitted, and we are in recess for the day. Thank you very much. Thank you very much.
judges: Berzon, Bybee, Cjj Graham (S. Ohio), Dj